```
-------------------------------------------------------x
                                           :
456CORP.                                   :
                                           :            3:09 CV 1983 (JBA)
                                           :
v.                                         :
                                           :
UNITED NATURAL FOODS, INC. ET AL.          :            NOVEMBER 29, 2011
                                           :
-------------------------------------------------------x
```

## RULING ON PLAINTIFF'S MOTION FOR SANCTIONS

On December 7, 2009, plaintiff 456Corp., d/b/a Natural Business Consulting Group ["plaintiff" or "NBCG"] filed this lawsuit (Dkt. #1), followed by an Amended Complaint on January 21, 2010 (Dkt. #15) and a Second Amended Complaint, filed on April 27, 2010 (Dkt. #29), against defendants United Natural Foods, Inc. ["UNFI"], Daniel Atwood, and John Raiche [collectively "defendants"], with respect to a credit card processing program ["CCP"] that plaintiff developed for UNFI. Plaintiff's Second Amended Complaint (Dkt. #29) alleged eight claims against defendants: Breach of Contract against defendant UNFI (First Count); Quantum Meruit against all three defendants (Second Count); Unjust Enrichment against defendant UNFI (Third Count); Breach of Covenant of Good Faith and Fair Dealing against defendant UNFI (Fourth Count); Fraud in the Inducement against all three defendants (Fifth Count); Misrepresentation against all three defendants (Sixth Count); violation of Connecticut Unfair Trade Practices Act ["CUTPA"] against defendant UNFI (Seventh Count); and Accounting against defendant UNFI (Eighth Count).[1]

On December 31, 2009, defendant UNFI filed its Answer, Affirmative Defenses, and Counterclaim and Third-Party Complaint (Dkt. #8; see also Dkt. #19), against NBCG and

---

[1]This count is erroneously listed as an additional Seventh Count.

Marc Warsowe, asserting seven claims: Breach of Contract against NBCG (Count 1); Breach of Duty of Good Faith and Fair Dealing against NBCG (Count 2); CUTPA against NBCG (Count 3); Fraud in the Inducement against NBCG and Warsowe (Count 4); Misrepresentation against NBCG and Warsowe (Count 5); Quantum Meruit against NBCG and Warsowe (Count 6); and Restitution for Unjust Enrichment against NBCG (Count 7). NBCG and Warsowe filed their Answer to the counterclaims on February 22, 2010. (Dkt. #21).

On May 11, 2010, defendants filed their Motion to Dismiss the Fifth and Sixth Counts against them (Dkts. ##35-36; see also Dkts. ##38-39), which was granted by U.S. District Judge Janet Bond Arterton on January 11, 2011 (Dkt. #48; see also Dkts. ##41-42, 44). Following a telephone scheduling conference held on March 2, 2010 (Dkts. ##20, 24), on March 8, 2010, Judge Arterton filed a Scheduling Order, which ordered that a settlement conference be held before a Special Master. (Dkt. #23, ¶ 5). On April 20, 2010, the file again was referred to a Special Master for settlement. (Dkt. #28, ¶ 3; see also Dkts. ##22, 27, 30).

At the conclusion of oral argument on August 17, 2010 before Judge Arterton on defendants' Motion to Dismiss, a brief discussion was held with respect to the settlement conference, at which counsel agreed upon Attorney Steven Ecker to serve as the mediator, to be held "sometime perhaps in the fall, maybe . . . before [the] January 4th [2011 status] conference, [so that] we can go through that process and see if it will bear any fruit." (Dkt. #44, at 39-40). The next day, August 18, 2010, the Court filed an Order of Referral to Special Master (Dkt. #43), appointing Attorney Ecker as a Special Master for purpose of conducting a settlement conference.

On December 29, 2010, the parties filed their Joint Status Report, which represented

that both counsel held a conference call with Attorney Ecker the previous day, that each party was going to submit an ex parte mediation statement by January 21, 2011, and that counsel were going to hold a preliminary meeting with Attorney Ecker on January 31, 2011. (Dkt. #45, at 2). The status report continued: "The purpose of this initial meeting will be to determine if the parties can have a productive mediation. The clients will be contacted via telephone during this conference because [p]laintiff resides in California and at least one individual [d]efendant is also located out-of-state." (Id.). On January 26, 2011, both sides submitted their ex parte mediation statements to Attorney Ecker. (Dkts. ##49-50). In their Joint Motion to Amend Scheduling Order, filed February 15, 2011 (Dkt. #51), counsel represented that they met for nearly four hours with Attorney Ecker on February 11, 2011, the purpose of which was "to determine whether a mediation with all parties present, some of whom are out of state, would be productive." (At 1). The Joint Motion advised that "[a]fter considerable discussion, the mediator concluded that it would be useful to reconvene with all parties present and that there was a chance that the parties could settle the action." (Id. at 2). As a result, counsel agreed to a "full mediation with all parties present in March, 2011[,]" which would require plaintiff to travel from California to be in attendance. (Id.).

On April 7, 2011, counsel filed another Joint Motion to Amend Scheduling Order (Dkt. #53), in which they represented that due to scheduling conflicts, the mediation could not be held in March, that in order to "assist the settlement of this case[,]" plaintiff noticed a Rule 30(b)(6) deposition of defendant UNFI for April 20, 2011 and defendant UNFI requested a damages analysis from plaintiff, and that the mediation was now scheduled for April 28, 2011. (Id. at 1-2). Due to last minute scheduling difficulties, the second mediation before Attorney Ecker took place on April 27, 2011, not on April 28.

On May 19, 2011, plaintiff filed the pending Motion for Sanctions, brief, and affidavits in support (Dkts. ##58-61)[2] regarding the mediation, as to which defendants filed their brief and affidavit in opposition on June 9, 2011.  (Dkt. #65).[3]  Plaintiff filed its reply brief on July 15, 2011.  (Dkt. #71; see also Dkts. ##67-70).[4]  On August 31, 2011, Judge Arterton referred this motion to this Magistrate Judge.  (Dkt. #94; see also Dkts. ##62, 66, 93, 97-98).

On July 15, 2011, defendants filed their Motion for Summary Judgment with respect to plaintiff's Second Amended Complaint, and on the same day, plaintiff and Warsowe filed their Motion for Summary Judgment regarding defendants' Counterclaims and Third-Party Complaint.  (Dkts. ##72-80; see also Dkts. ##86-90, 92, 95).  On November 10, 2011, Judge Arterton granted defendants' Motion for Summary Judgment with respect to plaintiff's Second, Third, and Seventh Counts, plaintiff withdrew its Eighth Count, and Judge Arterton denied their motion regarding plaintiff's First and Fourth Counts, leaving only those two counts for adjudication.[5]  (Dkt. #109; see also Dkts. ##103, 107-08).  Regarding plaintiff

---

[2]Attached to plaintiff's brief (Dkt. #59) are copies of four published decisions. (Exhs. A-D).

Attached to the affidavit of Marc Warsowe, sworn to May 18, 2011 ["Warsowe Aff't"], is a copy of Warsowe's travel invoices, totaling $1,023.52.  (Exh. A).

Attached to the affidavit of Attorney David Slossberg, sworn to May 19, 2011 ["Slossberg Aff't"], are copies of e-mails between counsel or Attorney Ecker, dated February 14, 17, 21 and 22, March 4, 7, 8, 9, 16, 17 and 18, and April 12 and 13, 2011 (Exhs. A-R), and time sheets for plaintiff's counsel, from March 21 through May 17, 2011, in the amount of $14,117.50 (Exh. S).

[3]Attached is the affidavit of Joseph J. Traficanti, sworn to June 8, 2011 ["Traficanti Aff't"](Exh. A), as well as copies of e-mails between counsel or Attorney Ecker, dated December 21, 2010, January 28, February 8, April 4, 5, 6, 7, and 12, 2011 (Exhs. B-H).

[4]Copies of additional published decisions are attached as Exhs. A-D.

[5]The Order contains a typographical error, in that the claim for Breach of Covenant of Good and Fair Dealing is the Fourth Count, not the Seventh Count.

4

and Warsowe's Motion for Summary Judgment, Judge Arterton granted their motion with respect to defendants' Counts 3, 4 and 5, defendants withdrew Count 6, and Judge Arterton denied their motion with respect to Count 2, leaving defendants' Counts 1, 2 and 7 for adjudication. (Id.).[6]  Last week, on November 21, 2011, plaintiff filed its Motion for Reconsideration with respect to its Seventh Count, alleging a CUTPA violation.  (Dkts. ##110-11).

For the reasons stated below, plaintiff's Motion for Sanctions (Dkt. #58) is denied.

## I.  DISCUSSION

In its motion and brief, plaintiff argues defendant acted in bad faith with respect to the April 27, 2011 mediation held before Attorney Ecker, which is especially "troubling [because] a two stage process was set up to avoid the very waste of time that ended up occurring [here]."  (Dkt. #59, at 11).   As plaintiff argues, defendants had ample opportunities to indicate that they were "not interested in engaging in additional settlement discussions and [were] inclined, for now, to proceed with litigation[,]" namely at the initial meeting with Attorney Ecker on February 11, 2011, and in responses to Attorney Ecker and plaintiff's counsel in their multiple e-mails.  (Id.).  Thus, plaintiff contends: "At each inquiry, [d]efendants did exactly the opposite – [they] reconfirmed  that the parties should proceed with mediation without any intention of negotiating in good faith.  The result was a waste of judicial resources, and unnecessary time and expenses incurred by . . . [p]laintiff."  (Id.; see also Dkt. #71, at 1-4).

In their brief in opposition, defendants represent that it was defense counsel who had

---

[6]The parties' Joint Trial Memorandum is due by December 2, 2011 and the pretrial conference is scheduled before Judge Arterton for December 13, 2011; jury selection is scheduled for January 4, 2012.  (Dkt. #107).

"specifically recommended" to plaintiff's counsel that the two-step process for mediation before Attorney Ecker. (Dkt. #65, at 3). Defendants argue that there is a "fundamental flaw" in "its characterization that [defendants were] not committed to the mediation[]" because it chose Joseph J. Traficanti, defendant UNFI's Senior Vice President, General Counsel and Chief Compliance Officer, to not only attend the mediation, but also to give defendants' opening statement. (Id. at 8). According to defendants, defendants were "clearly committed to the mediation as demonstrated by the fact that [defendants] did not take a no pay position, and by the fact that [defendants] put a settlement offer on the table, comprised of current and future amounts, while [p]laintiff did not, notwithstanding [defendants'] request to have one." (Id.; see also id. at 2).[7] Defendants further argue that "[p]laintiff's contention that UNFI was not committed to the mediation is mind boggling" in that Attorney Traficanti's father was terminally ill at the time and prior to his departure to Connecticut, he said his final goodbye to his father, who died the day after the mediation. (Id. at 2).

Not surprisingly, given the hectic litigation schedules of plaintiff's counsel, defense counsel, and Attorney Ecker, the parties encountered logistical difficulties in finding open dates for the first mediation session (see, e.g., Dkt. #65, Exhs. B-D), and even greater challenges in scheduling the second mediation session, at which the parties were to be in attendance. (See, e.g., Slossberg Aff't, Exhs. A-R; Dkt. #65, Exhs. E-H).

As early as February 21, 2011, it was clear from the e-mails that the parties had

_____

[7]The parties quite appropriately have refrained from offering specifics about the settlement discussions in their filings. (See Dkt. #59, at 6, n.3; Dkt. #71, at 2). See also In re A.T. Reynolds & Sons, Inc., No. 10 Civ. 2917 (WHP), 2011 WL 1044566, at *3, n.1 (S.D.N.Y. March 18, 2011)("Due to the confidential nature of the mediation, the . . . Court cautioned the parties at the . . . hearing to speak only in general terms. . . ."). See also id. at *8.

divergent views as to possible damages, if any, to plaintiff. For example, on February 21, 2011, defense counsel requested to see plaintiff's damages analysis "[b]efore locking in on a mediation date," and conveyed his belief that "the mediation would be more meaningful if [p]laintiff conducted its [Rule] 30(b)(6) deposition prior to the mediation[,]" in that "it is paramount that [Marc] Warsowe [plaintiff's President] avail himself of UNFI's accounting of its 'profits' under the CCP program to date, and understand that such profits were – and remain – minuscule." (Slossberg Aff't, Exh. D). Defense counsel continued:

> If [p]laintiff is claiming damages as "fair compensation for value received" by UNFI, then this should be addressed in [p]laintiff's damages analysis, and which should specifically include what [p]laintiff contends is the "value received" by UNFI, the sum that [p]laintiff is claiming that "fair compensation for value received," and how [p]laintiff derived that sum.

(Id.). Plaintiff's counsel responded the next day by e-mail, from a vacation in Israel, that his client's "principle position" is that "the reasonable compensation would be at a minimum" the six-figure contract price, and reiterated that plaintiff "would assume for the mediation that the program did not generate significant profits." (Slossberg Aff't, Exh. E). The e-mail went on:

> The [S]pecial [M]aster made clear that there are several ways to assess damages. I am very concerned that your clients seem stuck on this singular consideration of fair value, treating this as an exercise in assessing damages as if they did nothing wrong and that any such calculation must be based exclusively on revenues from the program. They seem to forget our breach of contract and [CUTPA] claim.

(Id.).

On March 4, 2011, plaintiff's counsel emphasized again in an e-mail that they were "most interested in . . . the financial performance of the program and documentation regarding the amount and nature of resources UNFI spent on the CCP." (Slossberg Aff't, Exh. F). Five days later, in e-mail sent on March 9, 2011, defense counsel again repeated

his request for "some form of a damages analysis" for analysis at the mediation, which "will only make the mediation more meaningful." (Slossberg Aff't, Exh. I). Defense counsel added:

> I understand your position that your client's damages are not capped by the profits generated by the CCP, which are minimal. Nonetheless, you still have to prove your damages even if you are suing in equity under quantum meruit. Further, as you know, only nominal damages are recoverable upon breach of a contract if no actual or substantial damages result from the breach or no damage is shown. You continue to contend that the parties agreed that compensation would be at a minimum of [the contract price], but that is not true. The contract expressly provides that NBCGroup's compensation has no minimum.

(Id.). Less than forty minutes later, plaintiff's counsel responded, with a concern that, "I am beginning to think you are trying to find a way out of this mediation." (Slossberg Aff't, Exh. J). As to damages, plaintiff advised:

> [A]lthough I sound like a broken record, we are seeking damages based on claims that your client did something wrong, which creates a substantial exposure for them in this litigation, as noted by the [S]pecial [M]aster. By insisting on focusing on the performance of the program and pressing for some other damages analysis, besides the [contract price] agreed to in the contract, your client seems intent on putting its head in the sand and treating this as something it is not. One purpose of the mediation is to hear from an objective third party as to the strengths and weaknesses of the case . . . .

(Id.).

One week thereafter, on March 16, 2011, Attorney Ecker sent an e-mail to both counsel, asking if the parties were still interested in meeting with him; he commented that "[i]f one or both parties declines to engage in further settlement efforts, that is certainly their right." (Slossberg Aff't, Exh. K). Plaintiff's counsel responded about four hours later, reaffirming the "representations by both parties that they were in fact committed to another mediation session . . . ." (Slossberg Aff't, Exh. L). Defense counsel replied the next day, March 17, 2011, that his clients are "still willing to attempt mediation," but that the response

of plaintiff's counsel to his requests for a damages analysis "misses the point. Plaintiff still has to prove damages even if [it] is suing under quantum meruit. I don't think the mediation is going to be useful unless plaintiff provides us with some basis and analysis for the damages [it] is seeking." (Slossberg Aff't, Exh. M). The remaining e-mails in April 2011 address only whether the mediation would be held on April 27 or 29. (Slossberg Aff't, Exhs. P-R; Dkt. #65, Exhs. E-H).

According to plaintiff, after plaintiff's counsel made an opening statement at the mediation on April 27, Attorney Traficanti "gave a relatively short response, concluding by saying, quite defiantly, that there are some cases that needed to be tried, and this was one of them." (Dkt. #71, at 2).[8] Attorney Ecker then met with defendants' representatives for approximately forty-five minutes, after which he reported back to plaintiff that "there was no serious basis upon which to settle or move forward with the mediation." (Id.). Plaintiff has observed that if "[d]efendants' desire was to try the case, which is their right, counsel could have informed [plaintiff's counsel] by phone in about thirty seconds." (Id.). However, plaintiff asserts:

> But what [d]efendants were not entitled to do was to indicate they had some interest in engaging in good faith conversations, have our client travel from California to attend, cause the Special Master to contribute additional volunteer time on the matter, and show up to tell everyone that some cases need to be tried, and this is one of them.

(Id.).[9] As set forth in plaintiff's reply brief, plaintiff's counsel previously had "clearly

---

[8]As Warsowe has averred: "It is my belief that [d]efendants materially misrepresented their commitment to and abused the mediation process as it became immediately apparent to me at the mediation that [d]efendants had no good faith intention to engage in settlement discussions." (Warsowe Aff't, ¶ 4).

[9]While plaintiff's counsel acknowledge that Traficanti "attended the mediation under difficult personal family circumstances[,]" and while they are "certainly very sorry for his loss, and express [their] condolences, those personal circumstances should play no role in determination of

communicated with opposing counsel that his client would have to be willing to pay some meaningful sum to settle[,]" with the discussions having been "framed around the . . . benchmark in the Contract, [which] provided a general reference for any discussions." (Id. at 2-3). According to plaintiff's counsel, when asked by Attorney Ecker at the first mediation session whether defendants "were only prepared to offer . . . [p]laintiff 'nuisance value' for its claims[,] . . . [defense] counsel denied that such a small amount was UNFI's settlement position." (Id.). Plaintiff previously had conveyed to defendants that "walk[ing] away from a counterclaim that has little value was not going to resolve the matter." (Id. at 2, 5).

As previously indicated, in light of Judge Arterton's ruling on the Cross-Motions for Summary Judgment, the lawsuit is proceeding only with respect to plaintiff's First and Fourth Counts, for breach of contract and breach of covenant of good faith and fair dealing[10] and on Counts 1, 2 and 7 of defendants' counterclaims, for breach of contract, breach of the duty of good faith and fair dealing, and unjust enrichment. (Dkt. #109).[11]

The parties rely primarily on seven decisions that are relevant to the issue here. As defendants point out (Dkt. #65, at 8-10) regarding the court-ordered mediation at issue in In re A.T. Reynolds & Sons, Inc., No. 10 Civ. 2917 (WHP), 2011 WL 1044566 (S.D.N.Y. March 18, 2011), described as having "reached an impasse soon after it began[]" and at which the creditor's attorney was "prepared only to repeat a pre-conceived mantra that [the creditor] was not open to any compromise that would involve 'taking a single dollar out of

---

[10]See note 5 supra.

[11]As previously noted, plaintiff recently filed a Motion for Reconsideration with respect to its Seventh Count, for CUTPA. (Dkts. ##110-11).

[its] pocket'[,]" id. at *3-4, "[c]ourts have not developed any clear standards for evaluating good faith in court-ordered mediation." Id. at *5. As a basic rule, "courts have interpreted good faith narrowly to require compliance with orders to attend mediation, provide pre-mediation memoranda, and, in some cases, produce organizational representatives with sufficient settlement authority." Id. (multiple citations omitted). As the District Judge explained: "Most courts . . . have declined to find a lack of good faith[]" when assessing "allegations of insufficient 'participation' during mediation proceedings (i.e., the degree to which a party discusses the issues, listens to opposing viewpoints, analyzes its risk of liability, and generally participates in the 'process' of mediation)." Id. at *6 (footnote & citations omitted). Bearing in mind the "well-settled" doctrine that "a court cannot force a party to settle, nor may it invoke 'pressure tactics' designed to coerce a settlement[]" with the threat of sanctions, the District Judge found that "a party is within its rights to adopt a 'no-pay' position." Id. at *7 (footnote & citations omitted). The District Judge also cautioned that "[i]nquiring into the parties' level of participation also imperils the confidentiality of the mediation[,]" explicitly holding:

> [C]onfidentiality considerations preclude a court from inquiring into the level of a party's participation in mandatory court-ordered mediation, i.e., the extent to which a party discusses the issues, listens to opposing viewpoints and analyzes its liability. This holding provides a clear and objective standard with minimal intrusion into confidentiality and a party's right to refuse to settle.

Id. at *8 (footnote omitted).[12] With respect to the issue of settlement authority, the District Judge held that "a party satisfies this requirement by sending a person with authority to

---

[12]Instead, "the scope of a court's inquiry into good faith[]" would be limited, inter alia, to a party's "demonstrat[ion of] dishonesty, intent to defraud, or some other improper purpose," because "the benefits of such inquiry into such conduct may outweigh considerations of coercion and confidentiality." Id. at *8, n. 4.

settle for the anticipated amount in controversy and who is prepared to negotiate all issues that can be reasonably expected to arise." Id. at *9. Like plaintiff (Dkt. #71, at 4-5), the District Judge in A.T. Reynolds distinguished between "[m]ediation [which] is typically a voluntary process[,]" as opposed to "a mandatory court-ordered mediation, [where] adversary parties are forced to participate in a collaborative process that one or both parties may not desire." Id. at *5. While there clearly are differences between the two, the underlying policy considerations are not at material variance in ruling on the present motion.

Defendants' actions here do not rise to the levels found in Francis v. Women's Obstetrics & Gynecology Group, P.C., 144 F.R.D. 646 (W.D.N.Y. 1992), Fisher v. Smithkline Beecham Corp., No. 07-CV-0347A(F), 2008 WL 4501860 (W.D.N.Y. Sept. 29, 2008), recon. denied, 2009 WL 899433 (W.D.N.Y. March 26, 2009), Pucci v. 19th District Court, No. 07-10631, 2009 WL 596196 (E.D. Mich. March 6, 2009), recon. denied, 2009 WL 816817 (E.D. Mich. March 27, 2009), and Guillory v. Domtar Indus., Inc., 95 F.3d 1320 (5th Cir. 1996), all cited by plaintiff, where courts imposed sanctions in favor of plaintiffs after finding that defendants had failed to act in good faith at settlement conferences. (Dkt. #59, at 9-10; Dkt. #71, at 6). Defendants are correct that these cases are distinguishable. (Dkt. #65, at 12-13). In Francis, defense counsel in a medical malpractice case raised for the first time at the settlement conference the issue of insurance coverage, "us[ing] that as a basis for not being in a position to make an offer." 144 F.R.D. at 648. The District Judge questioned why the mediator, the Court, and plaintiffs' counsel (who had traveled from Washington, D.C. to Rochester, New York), had not been notified of this critical issue before the conference, "so that the matter could have been rescheduled without inconveniencing and causing expenses to both the mediator and plaintiffs." Id. at 649. The District Judge admonished: "Such a

cavalier attitude about the settlement conference and its requirements cannot be countenanced." Id.

In Fisher, a product liability action involving a teenager who attempted suicide allegedly as a result of taking defendant's prescription medication, defendant filed its motion for summary judgment regarding its statute of limitations defense the day before the settlement conference in Buffalo, New York, the same day on which plaintiffs' counsel flew from New Orleans to attend the settlement conference; the plaintiff parents had to close their family restaurant for the day to attend the conference and plaintiff had to reschedule her biochemistry examination at college.  2008 WL 4501860, at *2.  Defendant offered $1,000 unless plaintiffs' counsel was able to explain why the action was not time-barred, and he was unwilling to engage in further mediation.  Id.  Under these circumstances, where defendant had made only a "'token' offer," and had filed its motion for summary judgment while plaintiffs' counsel was in transit from New Orleans to Buffalo, the Magistrate Judge found defendant's actions sanctionable and lacking in good faith, as defendant knew "full-well" that it "did not intend to engage in any mediation until and unless [p]laintiffs first explained why [d]efendant's asserted statute of limitations defense did not bar [the] action[.]" Id. at *5, 6-7.

Like Fisher, in Pucci, an employment discrimination action, defendants had filed a motion for summary judgment the day before a mediation was scheduled before a retired state judge; at the conclusion of the eight-hour session, a tentative settlement was reached and reduced to writing, signed by the parties present, which did not include a representative from the City of Dearborn, Michigan.  2009 WL 596196, at *2.  The next week, the Dearborn City Council held a closed session, at which the settlement was rejected, apparently in

accordance with a city council policy not to settle cases when dispositive motions are still pending.  Id.  Defendants conceded that their representatives at the settlement conference did not have settlement authority, as the City of Dearborn "was the entity that would pay any settlement."  Id. at *6.  The District Judge held that "the conclusion is unavoidable that . . . defendants did not participate in the mediation in good faith and the session ultimately was a waste of time and expense by . . . plaintiff."  Id.

Guillory was a products liability case, where the District Judge had imposed sanctions where "it became apparent that [the manufacturer] did not intend to make any substantial contribution to a settlement fund," and indeed "had never intended to do so[,]" had informed the court that the manufacturer "had always taken the position that this was a case which [it] would rather try[,]" and "had never considered settlement a realistic possibility because the present value of plaintiff's workmen's compensation was so large[]" that in order for plaintiff to settle and thus give up these benefits, the settlement fund "would have to be in the millions of dollars."  95 F.3d at 1334.   The manufacturer had given no prior "indication that it believed settlement to be a useless endeavor."  Id.   Under these circumstances, the Fifth Circuit upheld the imposition of sanctions, not "for failing to make a serious offer, but rather . . . because [the manufacturer] concealed its true position that it never intended to settle the case."  Id. at 1334-35.

Plaintiff argues  that the two most "analogous" cases are Pitman v. Brinker Int'l, Inc., 216 F.R.D. 481 (D. Ariz.), amended as to the amount of sanctions, CV 02-1886(PHX)(DGC), 2003 WL 23353478 (D. Ariz. Oct. 3, 2003),and Karahuta v. Boardwalk Regency Corp., No. 06-4902, 2007 WL 2825722 (E.D. Pa. Sept. 27, 2007).  (Dkt. #71, at 6).  In Pitman, an age discrimination case, plaintiff initially had appeared pro se and had made a demand of

$33,000 at the commencement of the lawsuit; prior to the settlement conference before a U.S. Magistrate Judge, plaintiff's counsel made a demand of $450,000, to which defense counsel responded that he believed plaintiff's case would not survive summary judgment and that "it would be in [p]laintiff's best interest to accept [defendant's] offer of a <u>de minimis</u> settlement amount." 216 F.R.D. at 483, 485. Defense counsel's authority at the settlement conference was only $1,075, which figure was never conveyed to plaintiff. <u>Id.</u> at 483. The Magistrate Judge held that "[d]efendant's offer of a <u>de minimis</u> settlement was ambiguous because it was not for a sum certain[,]" as plaintiff "might reasonably assume that <u>de minimis</u> could mean upwards of $30,000 or the cost of defense." <u>Id.</u> at 485 (footnote omitted). Among the various failures by defendant identified by the Magistrate Judge was defendant's lack of notification to "the Court of the great disparity between [p]laintiff's demand and [d]efendant's offer. Defendant did not notify the Court before hand that a settlement conference at this time would be futile act, thereby wasting the limited time, financial resources and energies of the Court and [p]laintiff." <u>Id.</u> at 486-87 (footnote omitted).

In <u>Karahuta</u>, a personal injury case, a settlement conference was held before a Magistrate Judge in early May 2007 at which defense counsel appeared with a corporate representative who lacked "full authority to settle[,]" in violation of a court order. 2007 WL 2825722, at *1. As a result, a second settlement conference was scheduled for late June 2007, with an order that defendant's decision maker, located in Las Vegas, be in attendance; the June conference was postponed at counsel's request until late July. <u>Id.</u> at *1-2. At the second conference, defense counsel appeared with the same representative as before, and not the upper management employee located in Nevada, and this same representative had

the "same limited authority that she had at the initial conference[,]" which was "insufficient to permit a settlement of the case." Id. at *2. When the Magistrate Judge placed a telephone call to the actual decision maker, he was told that the decision maker was on the telephone and unable to speak with the Court. Id. Sanctions were imposed upon defendant for, inter alia, noncompliance with the Court's multiple orders and failing to contact the Court about this, thus "wast[ing] the limited time, financial resources and energies of the Court and [p]laintiff." Id. at *6.

While there are admittedly some parallels with the instant case, as a whole, the Pitman and Karahuta decisions are distinguishable here. Unlike Karahuta, defendants did bring the decision maker to the second mediation before Attorney Ecker, namely Attorney Traficanti, who did not take a "no pay position," but instead "put a settlement on the table, comprised of current and future amounts." (Dkt. #65, at 8). And unlike Pitman, plaintiff's counsel and Attorney Ecker were aware of "the great disparity between [p]laintiff's demand and [d]efendant's offer[,]" 216 F.R.D. at 486-87, but Attorney Ecker, based upon his experience as a Special Master and with the first session, wanted to press on.

As previously indicated, as early as February 21, 2011, it was clear from the e-mails that the parties had divergent views as to possible damages, if any, to plaintiff, with defendants wanting Warsowe to "avail himself of UNFI's accounting of its 'profits' under the CCP program to date, and understand that such profits were – and remain – minuscule[,]" whereas defendants sought to be informed as to the "sum that [p]laintiff is claiming that 'fair compensation for value received,' and how [p]laintiff derived that sum." (Slossberg Aff't, Exh. D). Plaintiff's counsel responded the next day by e-mail, that his client's "principle position" is that "the reasonable compensation would be at a minimum" the six-figure

contract price, and reiterated that plaintiff "would assume for the mediation that the program did not generate significant profits." (Slossberg Aff't, Exh. E). The e-mail went on:

> The [S]pecial [M]aster made clear that there are several ways to assess damages. I am very concerned that your clients seem stuck on this singular consideration of fair value, treating this as an exercise in assessing damages as if they did nothing wrong and that any such calculation must be based exclusively on revenues from the program. They seem to forget our breach of contract and [CUTPA] claim.

(Id.; see also Exhs. F, I)(both sides repeating same demands on March 4 and 9, 2011).

On March 9, 2011, defense counsel advised:

> I understand your position that your client's damages are not capped by the profits generated by the CCP, which are minimal. Nonetheless, you still have to prove your damages even if you are suing in equity under quantum meruit. Further, as you know, only nominal damages are recoverable upon breach of a contract if no actual or substantial damages result from the breach or no damage is shown. You continue to contend that the parties agreed that compensation would be at a minimum of [the contract price], but that is not true. The contract expressly provides that NBCGroup's compensation has no minimum.

(Slossberg Aff't, Exh. I). Less than forty minutes later, plaintiff's counsel responded, with a concern that, "I am beginning to think you are trying to find a way out of this mediation."

(Slossberg Aff't, Exh. J). As to damages, plaintiff added:

> [A]lthough I sound like a broken record, we are seeking damages based on claims that your client did something wrong, which creates a substantial exposure for them in this litigation, as noted by the [S]pecial [M]aster. By insisting on focusing on the performance of the program and pressing for some other damages analysis, besides the [contract price] agreed to in the contract, your client seems intent on putting its head in the sand and treating this as something it is not.

(Id.).

By the following week, starting on March 16, 2011, Attorney Ecker joined the e-mail strings between counsel (see, e.g., Slossberg Aff't, Exhs. K-L), during which potential damages were raised. (Slossberg Aff't, Exh. L). Defense counsel replied the next day, March

17, 2011, that his clients are "still willing to attempt mediation," but that the response of plaintiff's counsel to his requests for a damages analysis "misses the point. Plaintiff still has to prove damages even if [it] is suing under quantum meruit. I don't think the mediation is going to be useful unless plaintiff provides us with some basis and analysis for the damages [it] is seeking." (Slossberg Aff't, Exh. M).

The parties, and Attorney Ecker, participated in the April 27th follow-up mediation, well advised of the fact that the parties had taken vastly different positions regarding plaintiff's potential damages. According to plaintiff, after plaintiff's counsel made an opening statement at the mediation, Attorney Traficanti "gave a relatively short response, concluding by saying, quite defiantly, that there are some cases that needed to be tried, and this was one of them." (Dkt. #71, at 2).[13] Attorney Ecker then met with defendants' representatives for approximately forty-five minutes, after which he reported back to plaintiff that "there was no serious basis upon which to settle or move forward with the mediation." (Id.). As previously indicated, many of the counts upon which plaintiff based its damages analysis, as reflected in the e-mails, are no longer in the case, such as quantum meruit, unjust enrichment, and CUTPA. (Second, Third and Seventh Counts).[14] Thus, as it stands right now, the computation of damages may be closer to that contemplated by defendants than by plaintiff. It cannot be bad faith for defendants not to have conceded to plaintiff's damages assessment. The parties' continuing interest in seeing Attorney Ecker for a second settlement conference, with parties present, appears to have stemmed more from hope and confidence that Attorney Ecker would be able to dissuade the opposing parties from their

---

[13]See note 8 supra.

[14]But see note 10 supra (regarding Seventh Count).

views than from lack of good faith.

Moreover, contrary to plaintiff's allegations, Attorney Traficanti has sworn in his affidavit that he "arrived at the mediation with an open mind and a genuine willingness to have a meaningful settlement dialogue with [p]laintiff and the Special Master[,]" that he had "ultimate authority to settle this case[,]" and that he felt it was "imperative" that he attend the conference instead of another company representative or in-house counsel. (Traficanti Aff't, ¶¶ 4, 7, 9). Attorney Traficanti also has averred that his father's terminal condition "in no way impacted [on his] ability to engage in the mediation in good faith[,]" that he has "no regrets" about making the decision to attend the mediation, and that he believes that "the mediation was productive even though the parties did not reach a settlement." (Id., ¶¶ 13-15). Plaintiff is correct to a limited extent that the tragic timing of the April 27th settlement conference, which compelled Attorney Traficanti to say his "final goodbye" on April 26 to his father, who passed away on April 28 (Traficanti Aff't, ¶¶ 10-11), "should play no role in determination of this motion." (Dkt. #71, at 2, n.1). The only impact that it has, however, is to support Attorney Traficanti's assertion that he attended the mediation with an "open mind." (Traficanti Aff't, ¶ 4). It is highly unlikely that a person would choose to give up his final one or two days with a parent on his death bed in order to attend a settlement conference that he knows will be a sham; if Attorney Traficanti had been truly insincere about attempting to settle this case, he easily could have chosen to send an alternative representative. Thus, given all the circumstances of this case, sanctions are not appropriate against defendants.

Defendants have cross-moved for attorney's fees in having to defend this motion, which they described as "specious and utterly frivolous." (Dkt. #65, at 14). Plaintiff had

appropriate reason to be disturbed by what transpired at the April 27th settlement before Attorney Ecker; defendants' actions, however, do not rise to the level where sanctions are appropriate. As a result, neither side is entitled to attorney's fees.[15]

## II. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion for Sanctions (Dkt. #58) is <u>denied</u>.

This is not a Recommended Ruling, but a ruling on a non-dispositive motion,[16] the standard of review of which is specified in 28 U.S.C. § 636; FED. R. CIV. P. 6(a), 6(e) & 72; and Rule 72.2 of the Local Rules for United States Magistrate Judges. As such, it is an order of the Court unless reversed or modified by the District Judge upon timely made objection.

<u>See</u> 28 U.S.C. § 636(b)**(written objections to ruling must be filed within fourteen calendar days after service of same);** FED. R. CIV. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary, H&HS</u>, 892 F.2d. 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**[17]

---

[15]Plaintiff had requested an opportunity to hold an evidentiary hearing, at which Attorney Ecker would testify. (Dkt. #71, at 6-7). The Magistrate Judge sees no need for an evidentiary hearing, and especially does not want to further inconvenience Attorney Ecker, who devoted countless hours to serving the Court in this file.

[16]<u>See Thomas E. Hoar, Inc. v. Sara Lee Corp.</u>, 900 F.2d 522, 525-26 (2d Cir. 1990); <u>Innis Arden Golf Club v. Pitney Bowes, Inc.</u>, 629 F. Supp. 2d 175, 191-92 (D. Conn. 2009).

[17]If both counsel believe that a continued settlement conference before this Magistrate Judge would be productive, they should contact Chambers **immediately**, in order to reserve one of the limited time slots left open before January 4, 2012.

Dated at New Haven, Connecticut, this 29th day of November, 2011.


  /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge